IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 14, 2018 Session

## STATE OF TENNESSEE v. BRIAN C. FRELIX

**Appeal from the Circuit Court for Williamson County**
**No. I-CR047982-C   Joseph A. Woodruff, Judge**

_____

### No. M2017-00388-CCA-R3-CD

_____

A Williamson County jury convicted the Defendant, Brian C. Frelix, of four counts of aggravated robbery, four counts of aggravated assault, one count of aggravated burglary, and one count of theft of property valued at one thousand dollars or more, but less than ten thousand dollars.  After a sentencing hearing, the trial court sentenced the Defendant to an effective sentence of thirty-eight years in the Tennessee Department of Correction. On appeal, the Defendant asserts that the trial court improperly: (1) denied his motion to suppress; (2) allowed Special Agent Andrew Vallee to testify based upon unreliable phone records; (3) admitted letters and testimony constituting hearsay; (4) admitted the victim's stolen credit cards; (5) admitted information from a co-defendant's Facebook page; and (6) imposed consecutive sentences.  After review, we affirm the trial court's judgments.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Jonathan W. Turner, Franklin, Tennessee, for the appellant, Brian C. Frelix.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Kim R. Helper, District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from an October 12, 2013, home invasion in Williamson County, Tennessee. The Defendant and a co-defendant entered a residence where the victims, a husband, wife, and two minor sons were present. The Defendant held the victims at gunpoint while the co-defendant searched the house for valuables. A Williamson County grand jury returned a fourteen-count indictment against the Defendant and two co-defendants. The Defendant was indicted for three counts of aggravated kidnapping, one count of especially aggravated kidnapping, four counts of aggravated robbery, one count of aggravated burglary, and one count of theft of property valued at more than one thousand dollars, but less than ten thousand dollars. In April 2014, a superseding indictment charged the Defendant additionally with four counts of aggravated assault.

**A. Motion to Suppress**

The Defendant filed a motion to suppress, asserting that his Fifth, Sixth, and Fourteenth amendment rights had been violated. At the suppression hearing, the following evidence was presented: Alan Keller, a Brentwood Police Department detective, testified that, in March 2014, he received a letter from a Williamson County jail inmate, Michael Reynolds, indicating that Mr. Reynolds had information from the Defendant about the home invasion. Mr. Reynolds and the Defendant had been cellmates for a period of time while incarcerated. Detective Keller conducted a recorded interview with Mr. Reynolds on March 20, 2014, at the Brentwood Police Department, about his alleged conversations with the Defendant.

Detective Keller testified that he never asked Mr. Reynolds to assist in the investigation or act as an agent in obtaining information from the Defendant. During the interview, Mr. Reynolds provided information that he would not have reason to know "without speaking to somebody involved in the crime." Detective Keller denied making promises to Mr. Reynolds with respect to his pending cases, but he did tell Mr. Reynolds that he "would ask the District Attorney . . . if there was anything that [she] could do for him." In the recorded interview, Mr. Reynolds asked Detective Keller about the possibility of putting money in his commissary account to enable him to communicate with law enforcement about any information he learned. At the hearing, Detective Keller denied putting money in the commissary account but said that he gave Mr. Reynolds two stamps that were in his desk drawer.

Detective Keller denied providing Mr. Reynolds with coffee "and/or any other incidentals" during the interview in exchange for his testimony or cooperation. He explained that the Brentwood Police Department policy was to provide food or beverages, "basic needs," during interviews. Detective Keller again met with Mr. Reynolds on March 26, 2014, when Mr. Reynolds confirmed that the Defendant wanted to speak with Detective Keller and provided a handwritten letter from the Defendant

stating the same. That afternoon, the Defendant was transported to the police department and spoke with detectives. Detective Keller explained that the Defendant was transported to the police department around lunchtime and, because the Defendant and Mr. Reynolds would miss lunch at the jail, he provided the men with lunch. He explained that this was "standard practice."

The letter Mr. Reynolds delivered from the Defendant to Detective Keller on March 26, 2014, was as follows:

> My name is Brian Cameron Frelix: [date of birth] [Social Security number]. I am authorizing Mike Reynolds to bring this letter to you. I am writing to cooperate & discuss the allegations and charges made against me. And other crimes that were committed that I am not charged with that happened earlier in the summer that my co-defendants did committ. [sic] Now I understand my Miranda Rights and do not need my lawyer present. The only way that this will happen is if Mike Reynolds is in the room with me while the interview is taking place. I'm not trying to be rude or heavy-handed, but I don't want to negogiate [sic] that part of the deal. I was not forced into writing this letter and I wrote this letter at my own free will. I'm not under any mind-altering medications and I'm writing this letter in a completely sane & sound mind.

The letter is dated March 21, 2014, and signed by the Defendant. During the recorded interview, the Defendant confirmed that the letter was written by him. Detective Keller also reviewed the Defendant's *Miranda* rights with him and the Defendant signed a waiver of those rights. The signed wavier was admitted into evidence. Detective Keller asked the Defendant if he wanted his attorney present, and the Defendant stated that he did not. The Defendant confirmed that he wanted Mr. Reynolds in the room during the interview.

Detective Keller testified that during the interview, the Defendant never indicated that he was "under duress," and never mentioned any physical complaints or complaints about mistreatment in jail.

On cross-examination, Detective Keller confirmed that he was aware at the time of the interview that the Defendant had an attorney. Detective Keller agreed that he provided Mr. Reynolds with coffee and a bag of chips during the March 20 interview. He also allowed Mr. Reynolds to use the phone. Detective Keller agreed that he told Mr. Reynolds that he could not act as an agent for the police department. During the March 26 interview involving the Defendant, Detective Keller agreed that several times Mr.

Reynolds "reminded [the Defendant] of something that . . . [the Defendant] had told him."

Carol Hughes, a Williamson County Sheriff's Office sergeant, testified that she oversaw the records division. Sergeant Hughes provided the Defendant's and Mr. Reynolds' jail records. The trial court entered the records into evidence. Sergeant Hughes said that the Defendant entered the Williamson County jail on October 16, 2013. She said that the Defendant had "quite a few jail infractions" and was placed on "lockdown" due to his behavior. The first time the Defendant was placed on lockdown was October 30, 2013. Based upon subsequent infractions, the Defendant remained on lockdown until July 2014. Sergeant Hughes explained that a lockdown occurs when "an inmate commits a jail infraction and they lose privileges. And they're removed from an open dorm pod and moved into a single man cell or a double man cell."

Sergeant Hughes testified that Mr. Reynolds and the Defendant shared a jail cell on the lock down unit from March 13, 2014 until March 20, 2014.

During the suppression hearing, both the defense and the State presented portions of the video recorded interviews, and the trial court stated its intent to review the interviews in their entirety. We have reviewed the March 20 interview with Mr. Reynolds and the March 26 interview with Mr. Reynolds and the Defendant. We summarize the discussion during both interviews in chronological order. At the onset of the March 20 interview, Mr. Reynolds stated that he "hope[d]" that the officers would speak to the District Attorney on his behalf but that, ultimately, he was motivated to speak with the detectives because he was troubled by the thought of the eleven-year-old minor victim having a gun held against his head during the course of the offense. Detective Keller stated to Mr. Reynolds that he could not make any promises with regard to the disposition of Mr. Reynolds' pending cases. Mr. Reynolds responded that he understood. Mr. Reynolds then provided details about the October 16 offense, such as how the intruders selected the house, how they entered, what occurred inside, and what the men did following the offense. Mr. Reynolds then recounted events surrounding other burglaries and robberies under investigation in other counties.

On the video recording, Mr. Reynolds suggested that he might be able to obtain more information from "Quan," one of the co-defendants. Detective Keller responded that he could not ask Mr. Reynolds to act as his agent. Detective Keller stated that "if it happen[ed] on its own," that was "fine" but that he could not instruct Mr. Reynolds to speak with anyone. Mr. Reynolds stated that he understood. Detective Keller told Mr. Reynolds that the "case was good before" but that Mr. Reynolds' information "confirm[ed] everything." Mr. Reynolds asked if it would be helpful for him to encourage the Defendant to write down the information. Detective Keller again

responded that he "can't have [Mr. Reynolds] do that." Mr. Reynolds then asked for a cigarette and another cup of coffee. Mr. Reynolds stated that it cost him money to communicate with the detectives through mail and asked if someone would put ten or fifteen dollars in his account. Detective Keller responded that he was not sure he could do anything in that regard but that he would "look into it." He suggested other possible avenues for communication.

Detective Keller left the room to get coffee and when he returned, Mr. Reynolds asked about using a phone in the room. Detective Keller gave permission for use of the phone and then left the room. Mr. Reynolds placed a brief phone call inquiring about money to put in an account. He then placed two other calls that appeared to be to attorneys representing him in other counties. He left messages notifying them that he had spoken with police providing information on unrelated cases. He placed two unanswered calls and then spoke with a female about letters he had written to her.

On the March 26, 2014 recording, Mr. Reynolds and the Defendant were alone in the room, and Mr. Reynolds encouraged the Defendant to be candid with the detectives and "don't hold nothing back." He told the Defendant to "be truthful, man." The two appear to have a congenial relationship and, after an officer brings in food, the two eat lunch together. The Defendant showed no observable sign of fear, discontent, or concern. Mr. Reynolds continued to advise and encourage the Defendant to be honest. They discussed the status of a co-defendant. They also talked about rap music and a television show.

The detectives entered the room and Detective Keller noted that he had already issued the *Miranda* rights to the Defendant but that he would review the rights again. He then confirmed that the Defendant initiated the contact with the police, and the Defendant identified the letter that Mr. Reynolds delivered to Detective Keller on the Defendant's behalf. The Defendant confirmed that the letter was in his handwriting and that he wrote the letter. The Defendant waived his rights and signed the waiver. The Defendant agreed that no coercion or threats had been used in order to obtain his statement. Detective Keller acknowledged Mr. Reynolds' presence in the room and told the Defendant that Mr. Reynolds could be removed at any time. Another detective asked the Defendant if he wanted his attorney present, and the Defendant said no. The detective then confirmed with the Defendant that he was willingly speaking with the detectives.

Detective Keller told the Defendant that they would review the Williamson County home invasion case, the case at issue in this appeal, first and then the Defendant was free to talk about any of the cases in other counties. The Defendant agreed and recounted what occurred leading up to the home invasion and their entry into the Brentwood residence when Mr. Reynolds interrupted to ask to go the bathroom. After he

exited the room, Detective Keller asked the Defendant whether he wanted to continue without Mr. Reynolds in the room. The Defendant responded that he wanted to continue with his statement. The Defendant talked in a narrative manner about various offenses committed in other counties. He was occasionally interrupted with follow-up questions from the detectives. At one point, Mr. Reynolds questioned what the Defendant was saying based upon a previous conversation between the two men at the jail. The Defendant, however, stood his ground as to his version of the events. Mr. Reynolds again left the room, and the Defendant continued with the interview.

On the recorded video, the detectives left the room, and Mr. Reynolds and the Defendant are left alone. The Defendant ate while Mr. Reynolds told the Defendant, "Don't leave nothing out" and told him not to lie. He then talked about the food they ate and digestion. The detectives returned and the interview continued. Detective Keller told the Defendant that he was free to talk about anything he wanted at that point in the interview. The Defendant disclosed details about unrelated offenses.

After the Defendant concluded his statements regarding offenses in other counties, the detectives left the room, leaving the Defendant and Mr. Reynolds alone in the room. Mr. Reynolds told the Defendant that he was concerned that the Defendant had withheld information. The Defendant claimed that he "isn't sure" about some of the information the detectives were asking him. He maintained that he did not know everyone's name involved and said that he had not seen one of the people discussed in six months. Mr. Reynolds then leaves the room and when he returned, the Defendant was escorted to the bathroom. While the Defendant was out of the room, Mr. Reynolds told Detective Keller that he was going to attempt to speak with "Quan," and Detective Keller responded that he could not assist or be involved in any way. The Defendant re-entered the room during the discussion, and Mr. Reynolds says to the Defendant, "We are talking about Quan."

The Defendant testified during the suppression hearing about his initial appearance in General Sessions Court. He recalled having "an incident" in jail that resulted in the Defendant being "tased" on his "right buttock." The Defendant said that he also suffered an injury to his feet but, due to the tasing, he could not remember what had happened, and the deputies would not tell him how his feet were injured. He said that, following his arrest, he experienced withdrawal symptoms from his drug use. He said that he experienced hallucinations and talked to "angels and [his] mom." He said that, at the time, he believed "everybody was trying to kill me."

The Defendant testified that he was placed on lockdown for nine months. He said that on lockdown a prisoner is released from his cell for only one hour a day. The Defendant said he was also placed in the "Crows Nest" for two and a half weeks. He described it as "the worse place to be." He said that he wore a "turtle suit," and was

"cold all the time." He said that he "got tased" and would wake up "hitting the wall." He recalled that he "cried a lot," did not eat, and did not sleep during this time, which added "to all the craziness." From the "Crows Nest," the Defendant was moved to a "suicide pod" for a month. He described this as "pretty much like the Crows Nest, except there were people around."

The Defendant testified that in late February, Mr. Reynolds was placed in a cell with him. The Defendant said that he and Mr. Reynolds remained cellmates until the end of March. He confirmed that Mr. Reynolds was his cellmate on the day the Defendant gave a statement to the police. About Mr. Reynolds, the Defendant stated that he was "pushy" and "you could tell he wanted to know some information about anything." The Defendant stated his awareness that Mr. Reynolds was trying to obtain information about the Defendant's case from him and noted that he also observed Mr. Reynolds engaging in this behavior with other inmates. The Defendant said that he "could already tell [Mr. Reynolds] was trying to talk to [him] and get [him] to say something." The Defendant recalled that on March 20, 2014, Mr. Reynolds became "more aggressive in his approach." On that date, the Defendant was also moved out of the cell for a few hours due to a misunderstanding. When he returned to the cell he had shared with Mr. Reynolds, Mr. Reynolds was gone. The Defendant was asleep when Mr. Reynolds returned. Mr. Reynolds woke the Defendant and told him that he had been questioned by the police about the Defendant.

The Defendant testified that Mr. Reynolds encouraged the Defendant to talk with police but when the Defendant "started getting mad," Mr. Reynolds "let it all go." The following day, Mr. Reynolds again encouraged the Defendant to speak with police. When the Defendant declined to do so, Mr. Reynolds threatened to harm the Defendant's family so the Defendant agreed to write a letter to the police as dictated by Mr. Reynolds. The Defendant stated that Mr. Reynolds also determined that the Defendant's lawyer should not be present but that Mr. Reynolds would attend the police interview with the Defendant. During the police interview, Mr. Reynolds would remind the Defendant of details that Mr. Reynolds wanted him to say.

The Defendant testified that, during the time leading up to the police interview, he was depressed, cried a lot, and was lonely. He said that he had had little experience with jail and little human interaction due to his placement on lockdown.

On cross-examination, the Defendant testified that he had graduated from high school and was in his first year of college at Tennessee State University at the time of the offense. At the time he was taken into custody, he was using "Lean," Xanax, marijuana, and drinking five or six bottles of "regular cough syrup" a day. He stated that his behavior when initially taken into custody was due to withdrawal from these drugs. The

Defendant stated that Sergeant Hughes "fabrica[ted]" his testimony that Mr. Reynolds and the Defendant were housed together from March 13 through March 20, 2014. The Defendant was adamant that Mr. Reynolds and he shared a cell on the Defendant's birthday, March 3.

The Defendant testified that he was afraid of Mr. Reynolds and believed that Mr. Reynolds was working with the Brentwood police. He stated that he wanted his attorney present but that he was afraid of Mr. Reynolds, so he told the police he did not want his attorney. The Defendant said that had he told the police he wanted his attorney or that he did not want Mr. Reynolds in the room, he would have been putting his family in danger. The Defendant identified a letter he wrote on March 30, 2014, to Detective Keller. He agreed that, at that time, Mr. Reynolds was no longer in the same cell with him. In the letter, the Defendant referenced his March 26 statement to police, stating that he wanted to correct a misstatement regarding the Belle Meade case. The letter reads, in part, "However everything else that I mentioned was undoubtedly the utmost truth. I'm a nuisance on your life for which you, the victims, and other law enforcement don't need at this time, which is why I'm writing you now trying to right all the wrongs." The Defendant denied any truth to his statements in the March 30 letter. Although Mr. Reynolds was no longer housed with him, the Defendant said he wrote the letter under Mr. Reynolds' instruction. He said that Mr. Reynolds sent him messages through other inmates at the jail, checking to see if he had mailed the letter yet. Still in fear for his family's safety, the Defendant drafted the letter and mailed it to Detective Keller.

The State then played a portion of a recorded jail phone call between the Defendant and his father that took place immediately after the Defendant provided his statement to the police on March 26, 2014.

> Defendant: Hey Dad. Okay, I been – I been praying about this, and – I'll just be honest. They got me. They got me dead cold, Dad. And, I mean, they have me to the middle. I mean, they – they got- they had me pinned down. I mean, like – the evidence – they just got me.
>
> Father: How do you know?
>
> Defendant: Cuz, I mean – I just know. I mean, one of my friends already talked, and – it just all – it just looked bad.
>
> Father: So you talked to them?
>
> Defendant: Hmmm?

Father:     So what does that mean?

Defendant:  I'm better off. I mean, if I wouldn't have talked – I mean, if I would have went to trial, Dad, they would have gave me life. I mean . . .

Father:     What are they going to give you now?

Defendant:  I don't know, but whatever I get now, it's gonna be ten times better than I would have got. Cuz I didn't tell them just about this incident. I told them about this incident and some other ones that I know about. And, uh, they were just –

    . . . .

Defendant:  I mean, if I get a good lawyer, it could – it could – I just need a – a good lawyer, really.

    . . . .

Father:     When did you talk to them? Today?

Defendant:  Yeah, just a minute ago.

Father:     You walked in there and talked to them?

Defendant:  Yeah, I mean, they just started asking me questions and I just started answering them.

Father:     Okay. I mean – at least they're gonna get you out of lockdown, anyway.

Defendant:  I don't even know if they're going to do that.

Father:     Yeah.

Defendant:  But, I mean – is, I'm – I'm way better off. If I would have been fighting this, Dad, it – it wouldn't have turned out good. I already know it. They already brought, uh – one – the one guy – that uh, they let out, they brought him back.

Father: Yeah?

Defendant: So, and I just found that out. So, and, they just – they, I mean, I think I did the right thing. Cuz if I –

Father: Did you tell them that you had the gun?

Defendant: I told them I had a gun.

Father: Oh.

. . . .

Defendant: Yeah, I mean they – I mean, the evidence that they showed in the prelim, that wasn't nothing compared to what they really do have. So . . .

Father: How do you know?

Defendant: Because, they – I mean – they basically told me what they really had. I mean, some of the stuff they already knew. Because somebody else talked and they –

Father: That guy they let out?

Defendant: Yeah, of course. But, they – it's, I mean, if the family would have got on that stand, like the little kid, if he would have got on that stand – I don't want to, I mean, to put him through that – I mean – it just didn't seem right, knowing that I'm wrong. I mean, I'm trying to – I'm trying to do whatever it takes to – to where I can see y'all again, cuz I don't want to be away from y'all no more.

The Defendant testified that he was not being honest with his father during the above telephone conversation. He affirmed that his statements, the letters he wrote, his statement that he understood his rights under *Miranda*, and his statements that he did not want his attorney present were all untrue and that he was now, for the first time, telling the truth.

- 10 -

On redirect examination, the Defendant confirmed that Mr. Reynolds was in the room with him during the telephone conversation with his father. The Defendant stated that from the time Mr. Reynolds was placed in his cell, every day he tried to convince the Defendant to speak with the police. The Defendant clarified that he was not saying that the statement he gave to the police "was completely untrue," and he was not saying that he was "innocent of this crime."

In a subsequent order, the trial court denied the Defendant's motion to suppress, finding that the Defendant's statement was knowing and voluntary.

## B. Trial

F.C.[1] testified that in October 2013, he lived on Moores Lane in Brentwood, Tennessee. He recalled the evening of October 12, 2013, saying that he walked with his two sons to a nearby grocery store. When they returned, they entered through the garage door, leaving the garage door open. Once inside, he and his sons joined his wife on the couch and began watching television. As they watched television, two black men entered the house. Initially, F.C. thought one of his neighbors had come by to visit, which was commonplace, but then saw that the men were strangers and carried pistols. He said the men's faces were mostly obscured with cloth.

F.C. testified that it was not uncommon for neighbors to stop by their house so he initially believed the intruders were neighbors, and the reality of the situation took some time for him to absorb. He kept asking the intruders if they were "kidding." F.C. said "only as they increasingly screamed profanities did I realize to my horror that this was an attack." F.C. said that he feared for his life and prayed for a peaceful resolution. F.C. said that the events of that night were "painful to recall" but "most shocking" was the fact that the intruders held a pistol to the temple of his youngest son, who was eleven years old at the time, for almost the duration of the invasion. One of the two men stayed with the family, ordering them to the ground and to be silent while the other man roamed throughout the house. The family complied in hopes that the men would not cause physical harm. They each lay face down on the floor with their hands behind their heads. The intruder who was watching them threatened to kill F.C.'s youngest son if any one of the family members moved.

F.C. testified that his older son kept looking at the intruder, and when the intruder noticed, he threatened him and kicked him. F.C.'s wife "instinctively, reached over to her son to comfort him," and the intruder became "really mad." F.C. recalled hearing a

---

[1] It is the policy of this Court to use initials in offenses involving minor victims. To further protect their identity, we also refer to their parents by their initials.

- 11 -

"thump" and then his wife say "ouch or respond in some way." F.C. said that he could hear the other intruder moving around the upstairs portion of the house looking for "goods and money." F.C. stated that, during this time, he did not believe he was free to move about. He said that he believed that if he had moved, he would have been shot.

After some time, the intruder who had been going through the house returned and the intruder who had stayed with the family ordered the family to get up and walk to the bathroom. As they walked to the bathroom, the intruder told them to stay in the bathroom completely quiet and threatened that if they told anyone, he would return and "get [them]." The intruder was holding F.C.'s wallet. He removed F.C.'s driver's license from the wallet and said, "I know who you are, I know where you live and if you tell anybody about this or if you come out of this bathroom . . . [before ten minutes is up] we're going to kill your boys in front of you and then we're going to kill you." F.C. said that the intruder repeated this threat and described what "it was going to look like." The intruder then shut the bathroom door and left.

F.C. testified that he still did not feel that he could leave the bathroom due to the intruders' threats to harm his family. He said that he was terrified and remained in the bathroom until his wife insisted that they exit the bathroom. He said that they exited the bathroom after hearing the garage door close, approximately a minute after the intruder closed the bathroom door on them. F.C. found his cell phone on the living room mantel and called their neighbors. F.C. said his youngest son was crying and begging him not to call anyone or tell anyone.

F.C. testified that the intruders took his wallet, which contained several credit cards and his driver's license. F.C. identified various credit and debit cards that had been stolen during the home invasion, including the American Express credit card used at Hunter's Market and Walmart. F.C. confirmed that, following the home invasion, he called all of the companies associated with his credit cards to notify them that the cards had been stolen. F.C. denied making a purchase at Hunter's Market or attempting to make any purchases at the Walmart on Charlotte Pike on October 12, 2013. In addition to his wallet, the intruders also took a "PS-3" gaming system, a "PS Vita . . . a handheld gaming system." He estimated that the PS-3 gaming system cost approximately $300.00 and the PS Vita cost $300.00 or $400.00. He said that the intruders took several hundred dollars in cash from his wife's purse. The intruders also took F.C.'s Lenovo Think Pad, valued at approximately $1,000.00, and his son's black backpack.

R.C. testified that she lived with her husband, F.C., and their two sons at the Moores Lane residence. On the night of October 12, 2013, her husband and their two sons, ages thirteen and eleven at the time, walked to a nearby grocery store while she remained home. Upon their return, they joined her in the living room. Within a minute

or two, two black men brandishing guns entered the residence. R.C. recalled that both men wore "beanie hats" with bandannas covering their faces. One of the men wore a dark sweatshirt with khaki shorts and the other man wore a gray sweatshirt with a white stripe and khaki shorts. The man wearing the darker sweatshirt, later identified as the Defendant, put a gun to her younger son's head and stated that the family would do what he asked or he would harm their son.

R.C. testified that she told her son not to move and instructed him to do whatever the Defendant asked. The Defendant then ordered the family to lie face down on the floor. Her older son turned his head to look at the Defendant, and the Defendant became angry and kicked her older son. R.C. reached out to comfort her son. R.C. then described the Defendant's response to her comforting her son, she stated, he "used his hand and with his gun and pushed me and punched me in my face, said didn't I tell you not to move, don't move." While doing so, the Defendant's feet were on her older son's back. R.C. confirmed that she sustained bruising in the area where the Defendant hit her that lasted for approximately a week. The Defendant remained with the family while the man in the gray sweatshirt went through the house.

R.C. testified that the men took F.C.'s wallet and later found her purse. Inside her wallet there was $40.00 or $50.00 dollars and in an envelope in her purse was approximately $1,000.00. She explained that, at the time, she was preparing to take a business trip to China, and the money in the envelope was for the trip. The intruders took all of the money from her purse. R.C.'s testimony describing the Defendant's threats and the progression of the invasion were consistent with F.C.'s testimony. She added that, while the family was in the bathroom, after the Defendant closed the bathroom door, she heard a lot of noise in the living room. When they exited the bathroom, she saw the television on the floor and a broken frame. She said that the men "just made a mess before they left."

R.C. testified that after the men left, her first reaction was to call the police despite the Defendant's threats. Her younger son begged her not to because he was terrified of the Defendant's threat to return and harm them. She first called her neighbors and then, with their "support," the police were called.

On cross-examination, R.C. testified that, in addition to the money stolen, the intruders took a "green purse" that contained a variety of gift cards. She confirmed that the electronics about which F.C. had earlier testified were stolen. She stated that the rooms upstairs appeared to have been rifled through by the intruder wearing the grey sweatshirt.

The older son, ("E.C. 1")[2] testified about the home invasion consistently with his parents' testimony. He described the Defendant as wearing black shoes, black socks with khaki shorts. He said that both men wore bandannas but no gloves. He said that the Defendant hit him in the face when he saw E.C. 1 looking at him. When R.C. reached out to comfort him, the Defendant hit her in the face too. For the remainder of the time that the family was lying on the floor, the Defendant kept his foot on E.C. 1's back. E.C. 1 stated that the Defendant used a lot of profanity and called his mother a "bitch." E.C. 1 recalled that while the Defendant remained in the room with the family, the other intruder went through the rooms of their home looking for "stuff to take."

E.C. 1 testified that, once they were in the bathroom, the Defendant threatened that if they reported the offense, he would "blow me and my little brother's brains out and he knows where we go to school." Due to this threat, E.C. 1 did not feel he could leave the bathroom.

The younger son, ("E.C. 2") testified consistently with his parents and brother about the course of the home invasion, the threats, and the stolen items. He stated that he was sitting in a chair when the two intruders entered and that one of the men put a gun to his head. E.C. 2 recalled that he was not ordered to get on the floor but remained in the chair "most of the time." E.C. 2 identified the black backpack that was found in the car associated with the robbery as his backpack.

Detective Keller testified that on October 12, 2013, he was notified of a robbery at a Moores Lane residence in Williamson County, Tennessee. At the residence, Detective Keller spoke with responding officers and then the homeowners. He learned that the family had walked home from a nearby grocery store. After they arrived home, they left the garage door open, and the intruders entered through the garage. The victims provided a description of the intruders and credit card information for an American Express card that had been taken during the home invasion.

Detective Keller asked the credit card holder, F.C., to contact American Express about the stolen credit card. From the company, he learned that a phone call had been made to the credit card company while the stolen card was being used at a Walmart on Charlotte Pike, in Nashville, Tennessee. The stolen credit card had also been used at Hunter's CeeBee Market ("Hunter's Market") also located in Nashville, Tennessee. The credit card company provided Detective Keller with the locations where the credit card was used and the phone number of the phone used to call American Express about the card. Detective Keller identified an American Express statement showing a list of

---

[2] The two sons have identical initials, thus we identify the older son as "E.C. 1" and the younger son as "E.C. 2."

transactions that occurred after the credit card was stolen and the location of the stores where the card was used.

Detective Keller testified that, with the information provided by the credit card company, he was able to develop a suspect. He said that he obtained surveillance video from the night of the robbery for Hunter's Market and Walmart. The Defendant was one of the suspects identified in the Hunter's Market video. Detective Keller stated that, in the surveillance video footage, the Defendant can be seen standing on the outside of the front door of the market wearing khaki shorts and a black shirt with black shoes. Hunter's Market also provided a receipt that involved the stolen American Express card.

Detective Keller testified that, during the course of the investigation, he learned that the vehicle associated with the robbery was owned by Justin Howell. Officers executed a search of the vehicle and seized two V-8 juice bottles, a black backpack, and three credit cards in the name of F.C. The black backpack matched the description of a backpack stolen from the Moores Lane residence on the night of the robbery.

Detective Keller testified that he interviewed the Defendant and, before discussing the robbery, the Defendant signed a *Miranda* Rights Waiver. The trial court entered into evidence the video recording of the March 26, 2014 interview with the Defendant, and the State played the recording for the jury. During the interview, the Defendant provided details about the October 12 offense, including how the intruders selected the house, how they entered, what occurred inside, and what the men did following the offense. The Defendant also described items taken during the robbery, including the black backpack that police seized from Mr. Howell's vehicle.

James Colvin, a Brentwood Police Department detective, testified that he learned of the robbery on Monday, October 14, 2013. On that day, he was assigned to follow-up on credit card information obtained from the victims. Detective Colvin went to Hunter's Market to retrieve the video surveillance footage, but employees were still attempting to retrieve the requested footage. Hunter's Market employees provided information about the transaction and confirmed that the victim's stolen American Express credit card was used at the Hunter's Market on October 12, 2013. Detective Colvin obtained the receipt from the transaction and identified the same receipt in court. He confirmed that there was a signature on the receipt but noted that it was "difficult to read."

Detective Colvin testified that he also went to the Walmart store located on Charlotte Pike in Nashville, Tennessee. At this location there appeared to be several transactions with the stolen American Express credit card. Detective Colvin obtained a copy of the receipt using the victim's stolen credit card at Walmart. The date on the

Walmart receipt was October 12, 2013. Detective Colvin also obtained October 12, 2013 surveillance footage from the Walmart.

Detective Colvin testified that, during the course of the investigation, he also conducted surveillance of Mr. Howell's vehicle and, later, he was involved in searching the vehicle. Detective Colvin identified the three credit cards found during the search of the vehicle. He said that the two credit cards that he found were located between the front passenger seat and the center console.

Brad McNabb, a Walmart asset protection manager, testified that in October 2013, he worked at the Walmart store located on Charlotte Pike in Nashville, Tennessee. He stated that he maintained all digital records for the Walmart store and that he provided to Detective Colvin a receipt for a transaction using an American Express card occurring on October 12, 2013, at 9:41 p.m. Mr. McNabb explained to the jury the information provided on the receipt and recited the purchased items. The receipt reflected that the customers attempted to purchase an iPad for $549, a Dell laptop computer, and two Play Station 3 games, one of which was rejected as it required identification because it was a "mature rated game." Four more items were added after the "mature rated" Play Station game was rejected: another Play Station 3 and three X-Box 360 games. The subtotal for the items was $1,286.80, and the total with tax, $1,405.83.

Mr. McNabb testified that, based upon the receipt, it appeared the customers attempted to use the stolen American Express card as payment, and the card was declined. The receipt also indicated that the cashier then voided the Dell laptop computer to "decrease the total," reducing the amount due to $916.39. The customers attempted to use the same card, and it was declined. The cashier then voided the iPad, reducing the amount due to $316.61. The customers attempted to use the same card, and it was declined. The receipt showed that the cashier ultimately aborted the transaction at 9:41 p.m.

Mr. McNabb testified that based upon the information on the receipt, he located corresponding video of the transaction. He identified the video recording of the transaction that he provided to Brentwood police. The State played the video recording of the transaction, and the events are consistent with Mr. McNabb's description of what occurred based upon the receipt. Still photographs of the defendants entering Walmart and attempting to purchase items were entered into evidence.

Andrew Vallee, a Tennessee Bureau of Investigation ("TBI") agent, testified that he worked in the Technical Services Unit analyzing any evidence that is technical or "cyber-related." After hearing his qualifications, the trial court, without objection, qualified Agent Vallee as an expert witness in the field of cellular communications

analysis. Agent Vallee described the process for analyzing cellular communications. He then stated that the Brentwood Police Department provided him with the cell phone number 615-500-4148 for analysis. Agent Vallee said that this number was associated with a "prepaid phone" and that T-Mobile was the network carrier for the number.

Agent Vallee testified that he used the cell phone number to access information that would indicate whether that particular cell phone was used in the vicinity of the crime scene around the time of the home invasion. Based upon the T-Mobile records provided for the number, Agent Vallee found that on October 12, 2013, from 7:28 p.m. to 7:53 p.m. the cell phone was accessing a T-Mobile cell site in the Cool Springs area. The T-Mobile cell site was 1.98 miles from the victims' residence. One incoming call was made to the phone using that cell site, and three outgoing calls were placed from the cell phone accessing the Cool Springs area cell site.

Agent Vallee noted an incoming call at 8:35 p.m. "that showed a zero." He explained that when there was a zero for the cell site, it generally meant that the cell phone being analyzed "was either powered off or was not connecting to the network." The trial court entered into evidence Agent Vallee's report outlining his analysis of the cell phone number.

The State recalled Detective Colvin who testified that, during the investigation of this case, he was provided with the phone number 615-500-4148 and determined that the phone number belonged to Dequan Bertrand, a co-defendant in this case. He explained that as part of his investigation he "searched Facebook" using the phone number. The phone number was associated with one profile, co-defendant Bertrand. Detective Colvin confirmed an association between the Defendant and co-defendant Bertrand based on co-defendant Bertrand's Facebook profile and the Walmart surveillance video. Detective Colvin stated that he provided the phone number to Agent Vallee for analysis.

Melanie Phillips, a Hunter's Market office manager, testified about the process for retrieving receipts from transactions that occurred at the store. She confirmed that she could retrieve a receipt based upon the last four digits of a credit card. Ms. Phillips identified an office-generated receipt for October 12, 2013, that was provided to the Brentwood Police Department. Ms. Phillips said that the transaction occurred at 8:58 p.m., and the customer purchased items totaling $65.00 using the victim's stolen American Express card. Among the items purchased were V-8 drinks.

After hearing this evidence, the jury convicted the Defendant of four counts of aggravated robbery, four counts of aggravated assault, one count of aggravated burglary, and one count of theft of property valued at one thousand dollars or more, but less than ten thousand dollars.

## C. Sentencing Hearing

Detective Keller testified that he worked with Detective Jeff Wiser, a Metropolitan Nashville Police Department ("MNPD") officer, during the course of this investigation because the MNPD was investigating "a similar set of crimes." Detective Keller recalled that, after his arrest, the Defendant became very combative and belligerent. He stated that, while the Defendant was in an interview room, he threatened to sue Detective Keller and also looked directly at the surveillance camera and "flipped his middle finger." Detective Keller described the Defendant's conduct as "[v]ery aggressive."

Detective Keller testified that based upon his thirteen years of work for the Brentwood Police Department he had become familiar with the Brentwood community. He stated that the impact of this home invasion had "a large impact" on the community, causing the residents to feel unsafe in their homes. He stated, "[w]henever there's a violent crime like this, it affects the whole community." Detective Keller said that, based upon the "violent nature" of this crime and the involvement of small children, he believed a "steeper sentence" would provide "relief" to the community.

On cross-examination, Detective Keller testified that, during his interview with the Defendant, the Defendant implicated Justin Howell and Dequan Bertrand in the offenses. Upon further questioning by the court, Detective Keller said that the Defendant never recanted his statements implicating his co-defendants. Detective Keller denied that the Defendant's statements "materially assist[ed]" in his investigation of Mr. Howell and Mr. Bertrand.

Detective Wiser testified that he was involved in the investigation of several crimes in Nashville involving the Defendant. The Defendant admitted to driving the victim's car to north Nashville. The Defendant was involved in another home invasion where the victim was raped and several items taken on October 15, 2013. There was another incident at Opry Mills when a sixty-six year old female was robbed and assaulted in the parking lot. Detective Wiser testified that the Davidson County cases against the Defendant were still pending.

On cross-examination, Detective Wiser testified that the Defendant told him that he had been using drugs. Specifically, he recalled the Defendant mentioning "Pluto," a combination of cough syrup and Jolly Ranchers. Detective Wiser said that the Defendant expressed regret and appeared "somewhat" remorseful. Detective Wiser agreed that the Defendant told him that he was outside in the car when Mr. Bertrand raped the victim and was unaware of the rape until "after the fact." He confirmed that the Defendant implicated the other participants in the crimes including a "Belle Meade incident."

On redirect examination, Detective Wiser testified that he could not recall what the Defendant had told him with regard to how he acquired the keys to the victim's car.

The State recalled Detective Keller, who testified that during the March 26 interview, the Defendant disclosed details of the Nashville home invasion when Mr. Bertrand raped the victim. The Defendant told detectives that as he was leaving the rape victim's home, Mr. Bertrand "tossed him the victim's [car] keys and said, 'Happy Birthday.'"

Brian Clifford Frelix, Sr., testified that the Defendant was his son. He stated that he was an assistant pastor at Priest Lake Community Baptist Church and a full-time student at American Baptist College. Mr. Frelix testified that his son had attended the Nashville School of Arts. At a very young age, two or three years old, the Defendant began displaying musical talent. The Defendant played the drums with a church band by the time he was age eight. The Defendant also learned to play the keyboard and would play at various churches for pay when he reached the age of fourteen or fifteen years old. Mr. Frelix described his son's demeanor as "laid back" and denied that his son had ever exhibited violent tendencies.

Mr. Frelix testified that, right before the Defendant went to jail, he obtained a "record agent" and was going to sign a record contract. Mr. Frelix testified that he noticed a change in the Defendant "right before he went to jail." He said the Defendant became "hyper, asking questions, jumping around, laughing." When he asked the Defendant about his behavior, the Defendant told him that he had been experimenting with mixing a drug.

Mr. Frelix testified that when he visited the Defendant in jail, he appeared shocked and was "very sorry and upset that he had done what he had done." He said that the Defendant expressed concerns about the children that were involved in the home invasion. Mr. Frelix said it was because of the children that the Defendant ultimately confessed. Mr. Frelix stated that he did not believe the Defendant would engage in any type of violent activity again because he was a peaceful person. He believed that the cause for this aberration in the Defendant's behavior was due to his drug use.

The Defendant testified that his mother had been violent toward him as a child. He noticed a change in his mother after her mother, the Defendant's grandmother, died. He was thirteen or fourteen years old when his maternal grandmother died. He said that, as a result of his mother's behavior, he was scared to go home. The Defendant admitted that he first used marijuana at age thirteen and began using daily by fifteen years of age. He stated that he was addicted to marijuana. When he went to college he began trying

- 19 -

different types of drugs. He stated that it was common in his "field in music" to use drugs. He said that he used marijuana first and then began taking Xanax and Lortab. The summer after his first year in college was difficult because his parents were going through a divorce and a friend had been murdered. The Defendant said he considered dropping out of school to explore music.

The Defendant testified that it was around this time that he began combining Delsym, Xanax, and Jolly Ranchers, which he referred to as "Pluto." He said this combination "messed [him] up." He regretted using the drugs and stated that, if released, he would not use drugs again. The Defendant admitted that he was high on drugs when he committed these offenses.

On cross-examination, the Defendant agreed that he was arrested in September 2012 in Davidson County for possession of a Schedule VI controlled substance. The Defendant agreed that he did not have a prescription for codeine syrup but stated that he had obtained it from "friends" at the age of seventeen when he began taking it. The Defendant stated that he began drinking alcohol at age sixteen and taking Xanax at age eighteen.

The Defendant testified that he had two separate pending cases in Davidson County. One case involved aggravated robbery, aggravated burglary and possession of a weapon during a dangerous felony that occurred on October 15, 2013. The other case occurred on October 14, 2013 and involved aggravated robbery, aggravated burglary, aggravated assault, and possession of a weapon during a dangerous felony.

The Defendant testified that, during the fall of 2013, he was pursuing his music career. He explained his relationship to Mr. Bertrand and Larue Dobson, co-defendants in the Davidson County cases, saying that they would provide him with food, drive him "around," and set up opportunities for him to play music. He denied that Mr. Bertrand and Mr. Dobson worked for him.

Upon further questioning by the trial court, the Defendant stated that the gun he used during the Brentwood home invasion was given to him by Mr. Dobson. He said that he believed the gun belonged to Mr. Dobson's father. He confirmed that the gun was not loaded. He said he knew this because there was no "clip and there was no bullet in the chamber."

After the proof, the trial court stated that in determining the sentence it was considering the evidence presented at the trial and at the sentencing hearing, which included the presentence report, principles of sentencing and the arguments of counsel. The trial court stated that it also considered the nature and characteristics of the crimes

and all evidence and argument offered by the parties with respect to mitigating and enhancement factors. The trial court had reviewed the information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses and considered the Defendant's testimony.

The trial court first determined that the Defendant was a Range I, standard offender. The trial court then considered mitigating and enhancement factors and sentenced the Defendant to ten years for the aggravated robbery convictions involving F.C. and R.C. and twelve years for the aggravated robbery convictions involving the two minor victims. The trial court sentenced the Defendant to five years for each of the two aggravated assault convictions and six years for each of the other two aggravated assault convictions. For the aggravated burglary conviction and the theft conviction, the trial court imposed four-year sentences. The trial court merged the related aggravated assault and aggravated robbery convictions.

The trial court then considered consecutive sentencing. The trial court found that the Defendant was an offender whose criminal activity was extensive. The trial court based this on the presentence report showing the pending cases that were committed within a 72-hour period after the home invasion at issue. The trial court stated, "The evidence shows that [ ] the Defendant and his companions were engaged in a three- or four-day spree of crime involving violent criminal offenses in multiple counties and the Court finds that the evidence is that that criminal activity was extensive." Next, the trial court considered whether the Defendant was a dangerous offender for purposes of consecutive sentences. It stated:

> When you select - -when you pick out a father and his two sons; his two children, who have not even reached adolescence, and you decide to stalk them and follow them and rob them in their home, you are undertaking an activity that is inherently and foreseeably risking violence up to and including the loss of life, and the [D]efendant was a willing participant. . . . [A]nd [the Defendant] was a willing participant in violent crimes because it was suggested to him by his friends, and there is no evidence whatsoever of any hesitation on the part of the [D]efendant to not follow the lead of Dequan Bertrand. And the Court finds under those circumstances, public safety is served by the imposition of consecutive sentencing.

Based upon these findings, the trial court ordered partial consecutive sentencing for an effective sentence of thirty-eight years. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court improperly: (1) denied his motion to suppress; (2) admitted Special Agent Andrew Vallee as an expert witness; (3) admitted letters and testimony constituting hearsay; (4) admitted the victim's stolen credit cards; (5) admitted information from a co-defendant's Facebook page; and (6) imposed consecutive sentences.

## A. Motion to Suppress

The Defendant contends that the trial court should have suppressed his March 26 statements to the police. He argues that because Michael Reynolds was acting as a government agent, the statements were illegally obtained. He also argues that he was denied his right to counsel and that his statement was a product of threat and coercion. The State responds that the trial court properly determined that Michael Reynolds was not a state agent, that the Defendant waived his right to counsel, and his statement was not a product of threat or coercion. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

### 1. Michael Reynolds

The Defendant argues that Michael Reynolds induced his statement and was acting as a "secret, agent of the police" while sharing a jail cell. The State responds that the trial court correctly determined that Mr. Reynolds was acting on his own. In the order denying the motion to suppress, the trial court made the following findings:

Defendant argues that Michael Reynolds was an agent of law enforcement when he convinced the Defendant to cooperate. However, the Court disagrees. Reynolds acted on his own in eliciting information from Defendant. Reynolds had used this tactic of eliciting information from fellow inmates in the past and profited by getting a reduction of his own sentence. He used the same tactic with the Defendant.

. . . .

While Michael Reynolds did request to be able to "work for" Detective Keller, Detective Keller made it clear that he could not ask Reynolds to do anything. Furthermore, Reynolds had requested to be able to return to the jail in order to obtain information from a different cellmate, Quan. Detective Keller made it clear that he could not ask Reynolds to do anything.

The Sixth Amendment right to counsel attaches after the initiation of formal charges. *Maine v. Moulton*, 474 U.S. 159 (1985); *Brewer v. Williams*, 430 U.S. 387, 401 (1977) (discussing *Massiah v. United States*, 377 U.S. 201 (1964)); *State v. Berry*, 592 S.W.2d at 557. In Tennessee, formal charges may be initiated by an arrest warrant, indictment or presentment. *State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996) (citing *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980); *State v. Butler*, 795 S.W.2d 680, 685 (Tenn.Crim.App.1990)). "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings. Interrogation by the State is such a stage." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (citations omitted). Once the defendant is indicted, he is entitled to rely on counsel as a "medium" between himself and the State. *See Michigan v. Jackson*, 475 U.S. 625, 632 (1986); *Moulton*, 474 U.S. at 176 *overruled on other grounds by Montejo*, 556 U.S. at 788. A Sixth Amendment violation does not depend upon coercion. *Wyrick v. Fields*, 459 U.S. 42, 54 (1982).

*Massiah*, relied upon by the Defendant, is the seminal federal case on the circumstances under which post-indictment statements made by an accused to an undercover government agent will be deemed an infringement of the accused's Sixth Amendment right to counsel. *Massiah*, 377 U.S. 201. In *Massiah*, the defendant and a co-conspirator were indicted for violating federal narcotics laws. The defendant retained a lawyer and pleaded not guilty. *Id*. at 202. He and his co-conspirator were both released on bail. *Id*. Unbeknownst to the defendant, the co-conspirator had decided to cooperate with law enforcement officers and allow them to install a listening device under the front seat of his automobile. *Id*. at 202-03. After the device was installed, the defendant and his co-conspirator held a lengthy conversation while sitting in the co-conspirator's

- 23 -

automobile; investigators monitored it from a car parked out of sight down the street. *Id*. at 203. Incriminating statements made by the defendant during the course of this conversation were introduced into evidence at trial over the defendant's objection. *Id*. The Supreme Court in *Massiah* held that the Sixth Amendment right to counsel "appl[ies] to indirect and surreptitious interrogations as well as those conducted in the jailhouse." *Id*. at 206. It found that the investigators had "deliberately elicited" the defendant's incriminating statements from him by use of the government agent "after he had been indicted and in the absence of his counsel." *Id*. Under these circumstances, the Court commented, "[The defendant] was more seriously imposed upon . . . because he did not even know that he was under interrogation by a government agent." *Id*. (internal citation omitted). It held that the investigators' deliberate elicitation of incriminating statements by the use of a government agent amounted to interrogation of the defendant "after he had been indicted and in the absence of his counsel," in violation of the accused's Sixth Amendment right to counsel. *Id*. at 206.

In *State v. Willis*, 496 S.W. 3d 653 (Tenn. 2016), our supreme court considered how courts are to analyze whether an informant was acting as a government agent at the time the incriminating statements were made.

> Evidence that [an informant] reached out to law enforcement officers does not equate to evidence of actions by law enforcement officials manifesting assent to have [an informant] act as a government agent . . . . The existence of an agency relationship cannot be proved based only on the actions of the alleged agent. In the context of the Sixth Amendment, "there is general agreement that affirmative conduct by a government official is required to convert an . . . informant into a government agent." *Hailey v. State*, 413 S.W.3d 457, 474 (Tex. App. - Fort Worth 2012) (quoting *Manns*, 122 S.W.3d at 187). "The government's willing acceptance of information provided . . . by an . . . informant did not make the informant the government's agent under the Sixth Amendment." *Elizondo v. State*, 338 S.W.3d 206, 211 (Tex. App. - Amarillo 2011), *aff'd,* 382 S.W.3d 389 (Tex. Crim. App. 2012). "[A]ll citizens . . . have a duty to report information about criminal activities, and while the Sixth Amendment may limit the government's ability to encourage such reporting behavior, the government should not be required to actively discourage such behavior either." *Manns*, 122 S.W.3d at 185 (emphasis in original).

In the present case, Mr. Reynolds initiated contact with Detective Keller after obtaining information from the Defendant. The Defendant was aware that Mr. Reynolds engaged in this type of behavior in an attempt to better position himself with regard to his own charges and yet still spoke with Mr. Reynolds about his involvement in the offenses.

There is no evidence in the record that Detective Keller had any role in placing Mr. Reynolds in the Defendant's cell. To the contrary, it appears that both men were in the cell due to their conduct while in jail. During the March 20 meeting, Mr. Reynolds expressed interest in "work[ing]" with the police and offered to try to speak with "Quan," a co-defendant. Detective Keller declined his assistance. Mr. Reynolds then asked if it would be helpful if he encouraged the Defendant to reduce the information to writing, Detective Keller reiterated that he could not ask Mr. Reynolds to assist him in any way.

Accordingly, the Defendant has failed to prove an explicit or implicit arrangement between Mr. Reynolds and Detective Keller for Mr. Reynolds to act as an agent of the government while housed with the Defendant. In the absence of proof showing that the government had agreed for Mr. Reynolds to act as a government agent in that meeting, there was no Sixth Amendment violation with respect to the incriminating statements made by the defendant. "[T]here is no infringement unless the informant was a government agent, and there is no agency absent the government's agreement [with] the informant for his services." *State v. Hernandez*, 842 S.W.2d 306, 316 (Tex. App.-San Antonio 1992) (quoting *United States v. York*, 933 F.2d 1343, 1357 (7th Cir.1991)). The Defendant is not entitled to relief as to this issue.

## 2. Right to Counsel

The Defendant asserts that his right to counsel was violated when the police unlawfully interrogated him without his attorney and that he never waived his right to counsel. The State responds that the Defendant waived his right to counsel after initiating contact with Detective Keller and expressing a desire to make a statement. In its order denying the Defendant's motion to suppress, the trial court made the following findings as to this issue:

> In the case at a bar, Defendant clearly and unequivocally waived his right to his attorney. Defendant wrote a letter to law enforcement requesting to speak with them about his crimes. In that letter, Defendant stated he did not want his attorney present. In addition at the beginning of the interview, Detective Keller read Defendant his *Miranda* Warnings, which Defendant clearly indicated (on the video) that he understood. Defendant signed this Waiver. (Exhibit 5) This Waiver included advice that Defendant has a Constitutional right to an attorney. Moreover, on more than one occasion, Detective Keller verified and reiterated with Defendant that he did not want his attorney present. All of these facts indicate a clear and unequivocal waiver by the Defendant of his right to counsel.

Furthermore, an examination of the totality of the circumstances also undoubtedly shows that Defendant clearly and unequivocally waived his right to counsel. Defendant is an educated man. That fact can be seen by his letters, which are intelligent, articulate, and well written. Also Defendant graduated high school and had attended some college. In addition, Defendant testified at the Suppression Hearing and was very articulate. Furthermore, Defendant contacted law enforcement – they did not contact him. Defendant also wrote a second letter on March 30, 2014, clarifying information he had provided on March 26, 2014. That letter, too, is very well written and reveals the work of an intelligent and educated man.

As previously stated, the right to counsel guaranteed by the Sixth Amendment and by Article I, section 9 attaches at the time the State initiates adversarial judicial proceedings against the defendant. *Michigan v. Jackson*, 475 U.S. 625, 629 (1986); *Huddleston*, 924 S.W.2d at 669 (Tenn. 1996). The Defendant's Sixth Amendment right to counsel had attached at the time of the March 26 interview. Nonetheless, that the Defendant's Sixth Amendment right to counsel had attached does not necessarily mean that the police questioning violated his Sixth Amendment right to counsel.

In *Patterson v. Illinois*, 487 U.S. 285 (1988), the Court rejected the defendant's argument - an argument that appears to be advanced by the defendant in this case as well - that the police were completely barred from approaching him once his Sixth Amendment right came into existence. *Id*. at 291. The Court explained that *Miranda* warnings effectively convey to a defendant his right to have counsel present during questioning and also adequately inform a defendant of "the ultimate adverse consequence" of making uncounseled admissions. *Id*. at 293. The Court further explained that *Miranda* warnings "suffice[ ] ... to let [the defendant] know what a lawyer could 'do for him' during the post indictment questioning" namely, advise him to refrain from making statements that could prove damaging to his defense. *Id*. at 294. Accordingly, the Court held that "[s]o long as the accused is made aware of the 'dangers and disadvantages of self-representation' during postindictment questioning, by use of the *Miranda* warnings, his waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'" *Id*. at 300.

The Defendant was indicted on March 10, 2014, and his arraignment was on March 24, 2014. In a letter dated March 21, 2014, the Defendant stated he was "writing to cooperate & discuss the allegations and charges made against me." He further stated in the letter, "Now I understand my Miranda Rights and do not need my lawyer present." At the onset of the March 26 interview, the Defendant admitted that he initiated the meeting, identified his handwriting, and confirmed that he wrote the letter seeking to

meet with the police. Detective Keller provided the Defendant *Miranda* warnings. The Defendant not only agreed to speak with Detective Keller, but he also signed a waiver of rights form. When asked, the Defendant responded that he did not want his attorney present. At no time during the interview did the Defendant request his attorney. On March 30, 2014, days after the interview, the Defendant wrote a second letter clarifying the information he had provided during the March 26 interview.

We conclude that the Defendant was informed by the authorities of his right to counsel and of the consequences of failing to exercise that right before he confessed to his involvement in the October 12 home invasion. On three separate occasions the Defendant elected to forgo the assistance of counsel and instead chose to communicate directly with law enforcement concerning his role. The Defendant requested the interview with the detectives. We conclude therefore, that the Defendant waived his Sixth Amendment right to counsel and that the trial court did not err by refusing to suppress the statements that resulted from the March 26, 2014 interview. The Defendant is not entitled to relief as to this issue.

### 3. Voluntariness of the Statement

The Defendant asserts that his statement was involuntary because it was induced by threat and ill treatment. The State responds that the trial court properly determined that the Defendant's statement was voluntarily made. In the order denying the motion to suppress, the trial court made the following findings as to this issue:

> Defendant's confession was voluntary. He was not coerced. He contacted law enforcement first. He waived his *Miranda* Rights. He made a detailed confession in an environment that was cordial and relaxed. He was allowed to have with him in the interview the individual he demanded to have – Michael Reynolds. Defendant is educated – a High School graduate with one year of college – and intelligent – as demonstrated by Defendant's letters. Defendant was returned to the jail and had four (4) days to ponder his confession. Then, after having this four-day time period, Defendant again wrote a letter to Detective Keller reiterating his confession and pleading for mercy.

To determine the voluntariness of a confession, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013); *see also State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) ("The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual

rights than the test of voluntariness under the Fifth Amendment."). In so doing, we must examine the totality of the circumstances surrounding the statement or confession, including "both the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson,* 530 U.S. at 434, 120 S.Ct. 2326). The circumstances relevant to this determination are:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep [,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id*. (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn.1996)); *State v. Blackstock,* 19 S.W.3d 200, 208 (Tenn. 2000) (recognizing that no single factor is necessarily determinative).

Considering the factors cited in *Climer*, we observe that the Defendant had finished high school and was attending college at the time of these offenses. He was also involved in other offenses leading up to the crimes in this case. The Defendant requested the interview, and the interview was not prolonged. He was advised of his *Miranda* rights before the interview, and he voluntarily waived those rights. The record contains no evidence that the Defendant was physically abused, threatened with abuse, or deprived of food, sleep, or medical attention. Included in the record are the Defendant's jail records, which indicate a pattern of non-compliance and disciplinary issues in the first weeks of his incarceration, resulting in his placement in "lockdown." The video recording of the interview shows the Defendant voluntarily providing the police with detailed information about the October 12, 2013 home invasion as well as offenses occurring in other counties. The police officers were not threatening, insulting, or coercive in any way. The Defendant's interactions with the detectives and Mr. Reynolds on the video recording appeared congenial. After the interview, the Defendant was allowed to make a phone call to his parents. On the phone call, the Defendant told his father that he spoke with the police and was "better off" having done so. He explained that the evidence against him was strong, and he did not want to make the minor victims have to testify in court. Four days after the interview, while Mr. Reynolds was no longer his cellmate, the Defendant again initiated contact with the police to clarify misstatements.

Accordingly, we conclude that the trial court did not err when it concluded that the Defendant's statement was not the result of coercion or threats. The Defendant is not entitled to relief as to this issue.

## B. Testimony about Phone Records

The Defendant contends that the T-Mobile phone call records were "unreliable" and thus, Agent Vallee should have been prevented from testifying about the records. The State responds that the trial court properly allowed Agent Vallee to testify about the cell phone data provided to him from T-Mobile. We agree with the State.

Reviewing courts will not reverse a decision regarding the admission or exclusion of expert testimony unless the trial court has abused its discretion. *State v. Reid*, 91 S.W.3d 247, 294 (Tenn. 2002). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008).

Tennessee Rule of Evidence 702, provides:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

At trial, after hearing Agent Vallee's training and qualifications, the trial court, without objection, admitted Agent Vallee as an expert in the field of cellular telephone communications. Rule 703 of the Tennessee Rules of Evidence contemplates three possible sources from which an expert may base his/her opinion: (1) information actually perceived by the expert; (2) information made known to the expert by others; and (3) information reasonably relied upon by experts in the particular field. *See* Tenn. R. Evid. 703; *see also* NEIL P. COHEN, ET. AL., TENNESSEE LAW OF EVIDENCE §§ 7.03(2), 7.03(3), 7.03(4) (3d ed.1995).

Rule 703 contemplates that inherently reliable information is admissible to show the basis for an expert's opinion, even if the information would otherwise constitute inadmissible hearsay. *See* Tenn. R. Evid. 703. It is not uncommon for an expert witness's opinion to be based on facts or data that are not admissible into evidence, but are reliable. *See* NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 7.03(4). In

determining the reliability of the underlying information, that underlying data must be such that experts in that field reasonably rely on them in forming the same kinds of opinions or inferences that the expert in this case did. *Id.* Thus, Tennessee Rule of Evidence 703 provides that an expert may base an opinion upon clearly inadmissible hearsay, if the type of hearsay is one that would be reasonably relied upon by experts in that situation.

In this case, before testifying about the T-Mobile records, Agent Vallee explained that a warrant was issued to obtain the records associated with the 615-500-4148 cellular phone number from T-Mobile. Relying on the data provided by T-Mobile, Agent Vallee obtained information to coordinate with a cell phone tower in the vicinity of the crime scene. Counsel objected, arguing that the information was generated from a T-Mobile computer system of which Agent Vallee had no personal knowledge. The trial court conducted an inquiry of Agent Vallee and concluded that the records were "a type reasonably relied upon by experts in the witness' field of expertise in forming opinions and images on the subjects and facts that he will be testifying to within the area of his expertise."

Furthermore, even though a trial court's role as a gatekeeper is critical, it is not unconstrained. When making an admissibility determination, trial courts are not empowered to choose between legitimate competing expert theories by excluding the lesser of the two. To the contrary, that task must be left to the trier of fact. *State v. Farner*, 66 S.W.3d 188, 207-08 (Tenn. 2001); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d at 265. The party proffering expert testimony need not establish that the expert testimony is correct, only that the expert testimony "rests upon 'good grounds.'" *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir.1998) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)). Where such a foundation exists, the proffered expert testimony "should be tested by the adversary process—competing expert testimony and active cross-examination - rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d at 85. The defense was able to thoroughly cross-examine Agent Vallee as to the records, procedures, and results reached in the present case. Thus, we conclude that Agent Vallee's testimony was properly admitted under Tennessee Rule of Evidence 703, which allows an expert to utilize inadmissible but reliable hearsay as a basis for their opinion. The Defendant is not entitled to relief as to this issue.

### C. Admission of the Defendant's March 21 Letter

The Defendant asserts that the trial court erred when it admitted "hearsay and authentication testimony regarding a letter shown to the police by Michael Reynolds."

The State responds that the trial court's admission of the letter was proper. We agree with the State.

The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court. With that principle in mind, we review the trial court's evidentiary rulings for an abuse of discretion. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997*); State v. Gray*, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997).

Under Tennessee Rule of Evidence 801, "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, there are exclusions to the hearsay rule. Rule 803(1.2) provides that "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(1.2) (2006). A statement need not be against interest when made by a party opponent to qualify for admission under Rule 803(1.2). The Defendant's statements, both written and oral, are admissible, subject to exclusion only by other rules of evidence. *State v. Binion*, 947 S.W.2d 867, 874 (Tenn. Crim. App. 1996); NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 8.06[3][a] at 8-47 (5th ed. 2005).

Here, the State introduced the letter from Defendant written on March 21, 2014, and delivered to Detective Keller on March 24, 2014. When questioned by police, the Defendant identified his handwriting in the letter and confirmed that he had written the letter to Detective Keller. To the extent that the Defendant complains that the letter was not properly identified as a condition precedent to admissibility, we conclude that the Defendant's expressed authorship of the letter on the recorded March 24 interview is sufficient authentication for the trial court to determine that the "matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Because the written statement was made by the Defendant and was not subject to exclusion under any other rule of evidence, it was properly introduced as an admission by a party opponent. The trial court did not err by admitting the letter. The Defendant is not entitled to relief as to this issue.

### D. Admission of Stolen Credit Cards

The Defendant argues that the State failed to establish a proper chain of custody for the stolen credit cards. The State responds that the trial court properly admitted the victim's stolen credit cards into evidence. We agree with the State.

The determination of whether the State has properly established the chain of custody of evidence is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *See State v. Cannon*, 254 S.W.3d 287, 295

(Tenn. 2008). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). Tennessee Rule of Evidence 901(a) provides: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." As our supreme court has held, "'[A]s a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" *Cannon*, 254 S.W.3d at 296 (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)). "The purpose of the chain of custody is to 'demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Scott*, 33 S.W.3d at 760 (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). The State should sufficiently prove each link in the chain of custody, but the State is not required to prove the identity of tangible evidence beyond all possibility of doubt nor must it exclude every possibility of tampering. *Cannon*, 254 S.W.3d at 296. In addition, the State's failure to call as a witness each person who handled an item does not necessarily preclude the admission of the evidence. *Id*. "Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id*. The trial court should not admit an item into evidence if the State fails to provide sufficient proof of the chain of custody, unless the identity and integrity of the item can be established by other means. *Id*.

At trial, Detective Keller testified that he was present when the vehicle used during the home invasion was searched and F.C.'s credit cards were found in that vehicle. Detective Keller observed the credit cards in the vehicle and then officers removing the credit cards from the vehicle. He then identified the evidence bag containing evidence seized from the vehicle, which included the three credit cards in the victim's name. Detective Keller explained that the items recovered from the search of the vehicle were "with another agency," the MNPD, because the search of the vehicle occurred in Nashville. Detective Jeff Wiser, a MNPD detective, delivered the package to him with an unbroken seal. Detective Keller confirmed that he was "the one that opened that package for the first time." Detective Keller reviewed the items in the bag, identified what items he needed for the instant case, resealed and initialed the bag, and then gave the evidence to the Brentwood Police Department's custodian of evidence, who entered and secured the evidence. Detective Keller stated that there was no indication on the package that it had been tampered with since the time he submitted it to the custodian of evidence. Detective Keller stated that "original seals" on the individual bags for each of the three credit cards were "still in place." Each of the credit cards bore the victim's name.

Over the Defendant's objection, the trial court found that the chain of custody for the credit cards established the identity and integrity of the items and admitted the credit cards into evidence. We find no error with the trial court's admission of the evidence. Detective Keller was present during the search of the vehicle. He received the credit cards in a sealed bag from an MNPD detective. The credit cards were individually bagged and the original seals were still present. Furthermore, each of the credit cards named the card holder. Accordingly, there was sufficient evidence presented to show that the credit cards were what the State claimed. The Defendant is not entitled to relief as to this issue.

### E. Co-defendant's Cell Phone Number

The Defendant argues that the trial court "wrongfully admitted hearsay Facebook evidence concerning" a co-defendant. The State responds that this testimony did not involve hearsay and was properly admitted by the trial court. We agree with the State.

As earlier stated, "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801. Detective Colvin's testimony about the course of his investigation was not a statement for the purposes of "hearsay." Detective Colvin was testifying about his investigation with regard to the phone number. He was provided with the phone number in association with the crime. One of the ways in which he investigates unknown numbers is by conducting a search on Facebook by phone number. He testified to the results of the search. Accordingly, the trial court did not err when it admitted Detective Colvin's testimony. The Defendant is not entitled to relief.

### F. Sentencing

As his last issue, the Defendant asserts that the trial court improperly imposed consecutive sentencing in this case. He argues that the trial court's findings that the Defendant had an extensive criminal record and was a dangerous offender are in error and, therefore, there is no basis for the imposition of consecutive sentencing. The State responds that the record supports the trial court's sentence. We agree with the State.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable:

(2) The defendant is an offender whose record of criminal activity is extensive;

. . . .

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; [or]

T.C.A. § 40-35-115. These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4). Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432S.W.3rd 851, 860 (Tenn. 2013).

The Defendant asserts that the trial court erred in finding that he had an extensive record of criminal activity because he had no prior convictions. The State responds that the trial court correctly relied on the pending offenses committed by the Defendant in October 2013. As the State correctly argues, this Court has held that "[c]urrent offenses may be used in determining criminal history for the purposes of consecutive sentencing." *State v. David Richardson*, No. W2016-00174-CCA-R3-CD, 2017 WL 401368, at *9 (Tenn. Crim. App, at Jackson, Jan. 27, 2017), *perm. app. denied* (Tenn. May 24, 2017). Therefore, the trial court did not abuse its discretion in imposing consecutive sentences based upon the numerous violent offenses the Defendant committed in October 2013.

The trial court also found, "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(4). Our supreme court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). Consequently, our supreme court in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is

necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004).

The trial court found that consecutive sentencing was necessary to protect society from the Defendant, when it stated that "public safety is served by the imposition of consecutive sentencing." The trial court considered the violent and terrifying facts related to the Defendant's participation in the home invasion in reaching this conclusion. The Defendant and his co-defendants observed F.C. and his sons returning home and selected them as victims. They entered the victims' home, with guns, knowing that children were present. The evidence supports the trial court's application of these two consecutive sentencing factors, and we conclude that the trial court appropriately found that both factors applied to support its order of partial consecutive sentencing.

We further conclude that the length of the Defendant's sentence is justly deserved in relation to the seriousness of these offenses and is no greater than that deserved for the offenses committed. The trial court did not order that the sentences for all of the convictions run consecutively, but instead it ordered that two of the six sentences run consecutively, for a total of thirty-eight years of incarceration. We conclude that the trial court properly ordered partial consecutive sentencing. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

- 35 -